May it please the Court, excuse me. My name is Stephen Walters. I represent the Legal Aid Services of Oregon. We refer to that as LASO in this case, plaintiffs. I'm going to be arguing on behalf of all of the appellants. This case involves First Amendment challenges. Would you mind just saying Legal Aid Services of Oregon? I'll do the best I can. Those acronyms, that reminds me of smoked salmon. I understand, Your Honor, I'll do the best I can. It's fairly ingrained. This case involves First Amendment challenges to laws and regulations that dictate what legal aid lawyers may and may not say on behalf of their clients in cases they are authorized to accept. These laws and these restrictions. Actually, they restrict what you may do. Well, Your Honor, I think you can't ask for attorney's fees and you can't pursue class action and you can't lobby and you can't solicit. There are restrictions technically on what you can't do. But, Your Honor, I guess I would disagree with you certainly with respect to attorney's fees because it says you can't ask for them. And so is that doing or asking? It's not saying you cannot take a position on behalf of your client against the government with respect to a particular theory or view of a case or an issue. It's not saying that. That's correct, Your Honor. It is not saying that. Which is not unimportant because that's what's going on in Velazquez III. That is, Your Honor, although in Velazquez III, the regulation said you could not either oppose or argue the validity of welfare laws. On its face, as Justice Scalia observed in his dissent, that was viewpoint neutral. It certainly was not content neutral. This -- excuse me. These restrictions apply to the activities of lawyers that are funded not only with Federal funds, but also with the funds from State and local and private sources. And it is also the case that is interpreted and applied by the Legal Services Corporation. These restrictions prevent all but a very few junior attorneys from engaging in restricted advocacy on their own time. Now, these restrictions were before this Court recently in a related case of State of Oregon v. Legal Services Corporation, which the Court held should be dismissed for lack of standing. This case is different. It involves First Amendment challenges. But beyond that, it involves First Amendment challenges by the programs, the lawyers, and the clients who are directly affected by this -- these regulations. Now, we have a number of assignments of error. They go to the district court's order dismissing the facial challenges to these restrictions that were alleged in our complaint. They go to the district court's dismissal on summary judgment of as-applied challenges to what is called the program integrity regulation, which is the regulation that enforces the limitations with respect to particular programs and prevents, we believe, lawyers from engaging in restricted advocacy on their own time. And our assignments of error include the district court's denial of our motion for a new trial when it turned out that the district court at summary judgment time didn't recall or didn't understand that the as-applied challenges to the subset of restrictions themselves had been dismissed by the district court early in the case. Because of the constraints of time, I'm going to focus on the summary judgment issue, and that is whether or not what is called the program integrity regulation, 45 CFR section 1610.8, provides adequate alternative challenges for restricted communication as interpreted and applied by the legal services corporation. And we respectfully submit that the district court erred both on legal grounds and factual grounds in granting summary judgment with respect to that particular regulation, to the as-applied challenges. The factual errors that the Court committed were in so many words disregarding evidence as to how the legal services corporation had interpreted and applied the program integrity regulation to other programs throughout the country. And we believe the record was fairly powerful in showing that there are virtually no – there is virtually no opportunity for lawyers who work at a federally funded program to work part-time for a program engaging restricted activities and to engage in those activities even when they are not working. And so the question is why in your view is evidence with respect to third parties relevant, because it is a case-by-case, total brutality of the circumstances kind of analysis that LSC makes, and the circumstances are different. I mean, so why is it relevant? Well, first of all, part of the evidence that the Court did not address in its opinion is a program integrity letter, October 10, 1997, that is in the record that sets out guidelines that are plainly applicable to all programs, plainly constitute an interpretation or an application rather than a facial matter that you can divine for the regulation, and says that for large programs, as a guideline, no more than 10 percent of your lawyers can work for a restricted program, even part-time, and that a senior official, like an executive director, shouldn't be able to do that at all. So that – certainly that is something that applies to everyone. But beyond that, Your Honor, the Legal Services Corporation requires that each program obviously comply with the program integrity regulation and that it certify annually its compliance with the program integrity regulation, and that it, in fact, directs programs to other interpretations and other applications to other programs for guidance in making that – in making that decision. Well, is that any different from just saying it's facially invalid? It is not, Your Honor, because the applications go – are fact-intensive. If it's not facially invalid, that makes that irrelevant. I'm sorry. I'm not following your question, Your Honor. With respect to – assuming it is not facially invalid, the fact is that in applying the program integrity regulation, Legal Services Corporation has made clear that no more than – but a very few legal aid lawyers for programs such as Legal Aid Services of Oregon may work part-time. And if that's okay, they should. Well, I guess we're getting confused here, Your Honor, because in – perhaps I am. I apologize. In the last three decisions, Justice White, writing for the panel, addressed the issue of whether or not lawyers could work part-time for another organization and he said, we believe they can. That's an as-applied matter. We now know with 12 years of history that that is not the case, that Legal Services Corporation prohibits all but perhaps a very few lawyers from working part-time for another organization. That is fact-specific. That is a – an as-applied challenge. And – and again, the Legal Services Corporation tells the programs that in certifying their compliance and in structuring their programs, they need to look at how they have been interpreted and applied the – the regulations to other specific programs. Now, one could argue that, well, but those – those situations were dissimilar. They weren't exactly the same as your – as your situation. But the district court did not engage in that analysis. The district court simply said they are irrelevant as a matter of law and – and in doing so, relied on cases from this circuit and the Supreme Court, the Broderick case in the United States v. Dang, which involved a situation where a statute was clearly constitutional as applied to the – the – to the plaintiff. In the Dang case, the question was whether or not it involved the moral turpitude exception to a citizenship application, and the – the plaintiff was arguing, well, this is unconstitutionally vague, except she'd been convicted of burning her van and injuring her child and – and committing that felony. And this Court said, well, in those circumstances, you – it's clearly constitutional as to you, and you can't argue otherwise. Similar situation in the Broderick case. It was a – a set of circumstances where the plaintiff admitted that the statute was constitutional as applied to them, but – but was trying to argue an overbreadth – make an overbreadth argument, and the Supreme Court said you cannot do that. But we – we think that the appropriate cases here are cases such as the LSO case from this Court, Porter v. Jones from this Court, Stefel v. Thompson from the United States, which have held that enforcement history is relevant evidence to determining the application of a statute or a regulation to a particular plaintiff. And that's what we're arguing here. We're not trying to argue the rights of California Rural Legal Assistance or Lane County Legal Aid Society. We are trying – we are saying that that is evidence of what we must do to comply with this regulation. Do you want to save some time? I do, Your Honor. I'd like to make one more quick point, and I will save the rest of my time. The point I would like to make is this. In addition to the evidence that I have walked through with you about how this interpretation has – or this regulation has been applied directly to us and why it is a fact-specific inquiry as to whether or not these situations are similar and really relevant, the District Court did not perform. In an affidavit submitted in the summary judgment proceedings, the Legal Services Corporation admitted that under the present configuration, Legal Aid Services of Oregon, which has total financial separation, total physical separation, all it shares with an unrestricted affiliate is a board of directors, which the Legal Services Corporation says okay. So even in these circumstances, only a limited number of Legal Aid Services of Oregon lawyers could work part-time, on their own time, for an affiliate or another organization engaged in restricted activities. We think that that admission in itself means that the summary judgment motion of the lawyers should have been granted, but at the very least, the case should be reversed just on routine summary judgment rounds and remain at the District Court to perform the sort of analysis and factual – fact-intensive analysis that we think is required. And I'll reserve the rest of my time. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. William Freeman, Cooley Godward Cronish, on behalf of Legal Services Corporation. And we would like to split our time. I'll take ten minutes, and Mr. Collette from the Department of Justice for Intervenor United States would take five minutes, if that's acceptable. May it please the Court. We are really here to discuss a very narrow question, and that is whether the program integrity rule of Legal Services Corporation is constitutional as applied to these plaintiffs. This Court has already determined that the rule and the congressional restrictions are facially constitutional, so we're really just dealing with the as-applied issue. And as the district judge observed, there's only been one application of the program integrity rule to these plaintiffs in this case. And to discuss that, I'll go into a little bit of the history. But this is all in the record, and I would ask the Court to take a look at our supplemental excerpts of record, which we cited in our brief, I believe pages 11 and 12. Oregon has long had a planning process through the Oregon State Bar. And in that planning process, there have been a number of constituencies who have on a continuing basis to decide how best to allocate the limited funds that are available in Oregon to serve poor people in civil cases. No one disputes that those funds will never be enough. We all wish there were a lot more than there are, but the Oregon State Bar and the leaders of these various organizations do engage in a concerted planning effort. And it is that planning effort which proves better than anything else that there is an adequate alternative channel for the expression of restricted rights outside of the federal program. And that's the test that has been enunciated by both the Second Circuit in Velasquez and by this Court in the Legal Aid Society of Hawaii case. This planning process began in 1996 at the time of the congressional restrictions. And it has been revisited in 2002 and in 2005. And the latest statistics that we have are for the year 2006 in which it was estimated by, and again, this is in the record by Mr. Thornburg, the Executive Director of the Oregon Law Center, that there were about $12.5 to $13 million total pool of funds available in the state of Oregon to serve low-income people in civil cases. Of that amount, the- It's not the former Attorney General or- No. No, that would have been Richard Thornburg, I believe. I don't know if they're related. I didn't ask that question in the deposition. Of that $12.5 to $13 million, Legal Services Corporation in 2006 granted $3.45 million or about 27% of the total pool of legal services funds available in Oregon. That's about a little bit less than half of the funding of one of the plaintiffs in this case, Legal Aid Services of Oregon. Under the program integrity rule, Legal Aid Services of Oregon could have taken all of its non-legal services corporation funds and given them to the Oregon Law Center, 100% consistent with the program integrity rule because it would have allowed the Oregon Law Center, which is an organization that shares the same board of directors as Legal Aid Services of Oregon, to engage in the kinds of activities that Congress restricted Legal Aid Society of Oregon from engaging in. These two organizations, there's a lot of evidence in the record. This was a summary judgment proceeding, and we developed a comprehensive record that these two organizations and the State Bar in general in Oregon coordinate extensively that they go to their various funding sources and suggest perhaps this year, more should be given to Oregon Law Center and less to Legal Aid Society of Oregon. And that's always been the case. And the State Bar, in our opinion, has done an excellent job of managing limited resources in precisely the way that Congress and Legal Services Corporation encouraged them to do. Now, what happened in 2005 was that for whatever reason, and we believe it's because the district court in New York had just issued the first Velasquez opinion, entering a TRO against the enforcement of the regulation, which was later overturned by the Second Circuit. But for whatever reason, Legal Aid Society of Oregon put together a proposal, a configuration proposal, which on its face didn't comply with the most basic of the requirements of the program integrity rule. Legal separation. You have to have two corporations. This proposal said, no, we want to be one corporation. We want to all sit in the same building. We want to have all we really want to. I'm sorry? What has integrity got to do with all of this? The reason for the integrity regulation, which is the similar regulation that the Supreme Court upheld in Rust, is simply so that the federal government is not seen to be speaking through one program which is engaging in conduct which Congress said you can't engage in. The courts have already decided that's not a First Amendment problem, so the cases, the Supreme Court cases, Rust and taxation with representation and League of Women Voters, all say that Congress can burden the expression of rights. Congress can tell recipients of federal funds you can't do certain things as long as they are not like the welfare restriction that was the subject of the Velasquez 3 case. You can't regulate the content of speech, but you can regulate, as you said, Judge Reimer, you can regulate activities, things you can do and things you can't do. So the district court in this case found that that. You can do that as long as it doesn't have a distortionary effect. We believe, Judge Nishimura, we believe that the distortion rule, which is the rule that the plaintiffs here argue that should be in place, has never been accepted by the Supreme Court or by any circuit. The Supreme Court in the Velasquez 3 case talked about distortion, but they also talked about content, discrimination based on content, and used distortion of the legal system, which is a limited forum, as a consequence of that content discrimination, not as the evil in and of itself. What's interesting about Velasquez 3, Your Honor, is that the Second Circuit in the Velasquez 2 case have lawyers who represent poor people, and they're restricted from espousing support for these programs and to raise funds and to go talk to their congressmen and try to improve the situation. They're restricted, Your Honor, when they're on company time. Legal Aid Society of Oregon attorneys can lobby on their own time. They can't go in and say, I'm John Smith from the Legal Aid Society of Oregon, but they can lobby on their own time. They can decide that they want to work for Oregon Legal Center. In fact, these organizations that coordinate with a single board of directors are the ones that are restricted in the first place. Because Congress decided that it didn't want federal dollars supporting certain activities, and every court that's looked at that said that Congress had the right to do that. Class actions, huh? Correct. Or other legislation that might help poor people. Well, Congress didn't say, though. Well, Congress originally said. The intent, though. Well, Congress originally said, you can't argue against welfare laws, right? You can't espouse a certain argument. And the Supreme Court said, that's an impermissible content restriction. But in terms of activity restrictions, one of the courts said, Congress could have said, here's $100 million to legal services organizations around the country. You can use them for domestic relations cases and nothing else. That would have been constitutional. Congress can decide what activities it wants to fund. It can't decide what words people can use. And we understand that restriction, and that restriction has been on the books ever since the Velazquez III case. It can't decide what words people can use. No, I said the Congress can't tell you, you can't make this argument. I don't think you're coming across fairly. Congress can or cannot. Cannot. That was the Velazquez III case. Congress cannot require a lawyer to refrain from making a particular argument. But it can require legal services organizations and lawyers from engaging in particular types of cases or using particular tools in the toolbox. I see my time is up, and I'd like the government to have a lot of time as well. So if there are no further questions. Thank you, Your Honor. May it please the Court. I am Matthew Collette from the U.S. Department of Justice on behalf of the Intervenor United States. I'd like to start with a statement that counsel made, which I think reflects the plaintiff's fundamental misunderstanding of the Velazquez decision. Counsel said that the decision involved a restriction on any advocacy involving a welfare reform statute. In fact, that's not the case. They say in their brief, if you rewrote the prescription to say no advocacy about welfare reform for or against, that would violate Velazquez. Not so. The Second Circuit in the Velazquez II case, in fact, dealt with the overall restriction, which said you may not advocate in any case involving an effort to reform the welfare system for or against. Second Circuit upheld that, saying it's viewpoint neutral. What the Second Circuit went on to do is say, now we have this exception that says, but you can represent somebody in a suit for individual benefits against the government. And what was unconstitutional there was a proviso, which said, but you cannot challenge existing law. That was called the suits for benefits exception or proviso. And the Court, in fact, in the Second Circuit, severed the other decision. It said the welfare, general welfare reform provision remains constitutional, but this proviso is what goes. That was what was before the Supreme Court. And the Supreme Court said, that is not viewpoint neutral. It prohibits a specific argument in a case against a specific defendant, the government. And the Court very clearly said, you can't essentially carve out or prohibit ideas that the government finds troublesome. What they're trying to say here is that Velazquez created a whole new standard that essentially constitutionalizes the attorney-client relationship. Anything that supposedly distorts the system is unconstitutional. Fast forward again, the Second Circuit expressly rejected this in Velazquez 5, which has been retitled Brooklyn Legal Services. Specifically addressed the application of that to program integrity regulations and to the class action attorney's fees and solicitation restrictions. And said, Velazquez 3 doesn't cover that. If you look at their distortion theory, it would apply virtually to anything counsel wants to do. If counsel says, I think lobbying would best serve my client, their view is Velazquez 3 would prohibit the government from saying, no, you cannot do that with an LSC-funded program. That doesn't even occur in the courtroom. The only thing that Velazquez 3 prohibits is the making of a specific argument in a specific case that takes a specific viewpoint. And none of these restrictions do that. So I did want to make clear also in the reply brief, they say we don't disagree that these distort the legal system. On the contrary, we strongly disagree with that notion. Mr. Collette, you know, there's some legislation that's like halfway through Congress now. Yes. It might affect this case, right? Yes, and we'll certainly inform the court if that passes. I've learned through hard experience that, of course, what may pass one house of Congress may not happen at all. There's a Senate bill, I think, that would change the attorney fee restriction or lift that. The House bill, I think there was something about the class action restriction may be going. But that's, of course, up to Congress. As far as you know now, it wouldn't completely move this case? No, that doesn't deal with the program integrity regulation. All right. But I think it's important to address this because the plaintiffs here want to do two things. One, they want the court to say that controlling precedent of this court, which establishes a standard that says it's only unconstitutional if it effectively prohibits the creation of alternative avenues, lash three. They want to say that's been superseded by Velazquez. I don't think that's right. They also want this court to create a circuit conflict because the Second Circuit, both before in Velazquez two, left intact by Velazquez three, and after in Velazquez five, upheld these very restrictions. We think Velazquez five was correct. We think lash three remains the controlling precedent of this court. And so we urge the Court not to create a circuit conflict and not to say that existing precedent has been overruled. Thank you, Your Honor. All right. Thank you, Your Honor. Excuse me. We addressed the arguments related to Velazquez and the facial challenges in our briefs and are happy to submit those issues on the briefs. I would like to make two points related to the argument that was made on the summary judgment issue and on the summary judgment record. Legal Services Corporation argued that simply the fact that the State of the Oregon Legal – Oregon Law Center, the unrestricted organization, exists, and that the State of Oregon has tried to make the best of a bad situation by coordinating activity shows in and of itself that there is an adequate alternative channel for communication. And we respectfully submit that that – simply that existence, and this is the error the district court made, the existence of an affiliate does not mean that it is adequate. You have to inquire on that – into that. And there are affidavits in this summary judgment record, probably seven, eight, nine affidavits, showing how it is not adequate. It does not allow an adequate alternative channel for communication of the restricted speech, particularly in a State such as Oregon, which is the consummate example of an as-applied challenge. Second, there was a reference to Rust v. Sullivan. The Rust court made very clear that there is not a constitutional problem as to the employees of those programs, because nothing kept them on their own time from working for an organization that allowed them to engage in abortion counseling. Here, the record shows that this program integrity regulation as interpreted and applied by Legal Services Corporation does prevent all but a very few, a limited number, as Legal Services Corporation said in its affidavit submitted in this case of lasso attorneys to engage in restricted speech, working on their own time. We respectfully submit that, again, that means their motion should have been granted, but at the very least, these intensely factual issues regarding application of this program integrity regulation should be reversed and remanded to the district court for further proceedings. Thank you very much. Thank you very much. This matter will stand submitted. And now we come to the final matter on our calendar. Reardon v. State Farm Mutual Automobile Insurance Company.
judges: Pregerson, Rymer, Tashima